Stephen D. KATES, Plaintiff

v.

The ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant

Civ. A. No. 76–2070–K.

United States District Court, D. Massachusetts.

March 9, 1981.

Thomas E. Cargill, Jr., Cargill, Masterman & Cahill, Boston, Mass., Leo J. Hession, Bladwin, Copeland & Hession, Wellesley, Mass., for plaintiff.

Stephen A. Moore, Gaston Snow & Ely Bartlett, Boston, Mass., for defendant.

### Memorandum

KEETON, District Judge.

Plaintiff commenced this action by filing a "complaint for declaratory judgment and relief" in the Superior Court of the Commonwealth of Massachusetts. Defendant removed to this court, which has jurisdiction under 28 U.S.C. §§ 1332 and 1441 because plaintiff is a citizen of Massachusetts, defendant is a Minnesota corporation (hav-

ing a principal place of business in Minnesota and not in Massachusetts, and not having been incorporated under the laws of Massachusetts), and the amount in controversy exceeds $10,000 exclusive of interest and costs. The case was tried before the court without a jury. The court's findings are stated in parts I, II and III–A of this memorandum, and conclusions are stated in parts III–VII.

## I.

Plaintiff sues on a certificate of insurance effective December 15, 1973, providing for payment of 60% of income subject to a maximum of $800 per month during a period of total disability. Plaintiff became totally disabled on September 13, 1974 as a result of an accident covered by the certificate. Defendant commenced payment of the sum of $800 monthly together with additional sums as provided by the policy during hospitalization. Because of plaintiff's receipt of other benefits, defendant reduced the monthly payments to $377.80 effective July 1, 1975, thereafter reduced benefits further, and eventually terminated benefits altogether. Plaintiff seeks a declaration that defendant has been and is liable for continued payments at the rate of $800 per month. Defendant admits that plaintiff became totally disabled on or about September 13, 1974 but denies that plaintiff is entitled to the relief requested. Defendant also counterclaims for the return of all and, alternatively part, of the amounts paid by defendant to plaintiff.

On December 15, 1970, Group Service Corp. applied to defendant for a master policy. The application was accepted and defendant issued Master Policy No. SCD866JM2557 (the "Master Policy").

The application was executed on behalf of Group Service Corp. by Irving Backman, as President. Irving Backman also signed the application as the witnessing agent. Irving Backman solicited coverage under the Master Policy through Labac Insurance Agency, Inc. Coverage under the Master Policy was provided to numerous corporations (as well as their affiliates, in some instances) and their employees, all in consideration of the payment of premiums and the execution and submittal of enrollment applications.

The Massachusetts State Pharmaceutical Association (the "M.S.P.A.") was ". . . added to the coverage afforded by this Policy," effective December 15, 1973, by Endorsement 13. Initially, 62 persons submitted applications for certificates and were insured pursuant to the solicitation of pharmacists. See Endorsement 13. That number was reduced to 60 insured persons and the effective date of the coverage was amended to January 14, 1974. See Endorsement 13–1.

At some time in late summer or early fall, 1973, an insurance representative named Michael Gerber appeared at plaintiff's place of business, Prescription Center, during working hours, and inquired whether plaintiff and his partner had disability insurance protection. Gerber described to plaintiff the Master Policy and the amounts of coverage it provided. All information the plaintiff received about the coverage came to the plaintiff at his workplace, Prescription Center.

The plaintiff and his business partner, Gerald Grocer, doing business as Prescription Center, purchased the insurance coverage, and applications for certificates of insurance coverage were completed for both the Plaintiff and Gerald Grocer. Exhibits 3 and 4. The semi-annual premium in the amount of $74.00 for each applicant was remitted to the agent with the completed application. A Certificate of Insurance under the Master Policy, Certificate No. 0–52, was issued by the defendant to the plaintiff as an "Insured Person," effective December 15, 1973. Exhibit 5.

The plaintiff paid all premiums due from him in a timely manner.

On September 1, 1974, the plaintiff was injured at work. Since that time he has not worked at any gainful occupation. The plaintiff is totally and permanently disabled from any gainful employment and is a paraplegic.

The defendant commenced paying the plaintiff benefits in the amount of $800.00 under his Certificate of Insurance in October 1974, and also paid additional benefits of $400.00 per month during the period when the plaintiff was hospitalized.

Commencing in March, 1975, the plaintiff became entitled to and received primary Social Security Disability benefits in the amount of $390.90. Exhibit 7. Starting in July, 1975, the plaintiff's monthly benefits were increased to $422.20; in July, 1976, and thereafter further increases of his monthly benefits occurred.

Commencing in July, 1975, the defendant reduced the plaintiff's monthly benefits due under his Certificate of Insurance by $422.20, the amount of Social Security benefits the plaintiff was receiving at that time. Thereafter, the defendant, commencing in March, 1977, further reduced the monthly benefits payable to the plaintiff under the Certificate by an amount the defendant understood to be the increase that the plaintiff had received in his monthly Social Security benefits. Exhibit 8.

On November 8, 1976, the plaintiff received an award under the worker's compensation statute. From the date of his injury in September, 1974, to the present and continuing into the future, the plaintiff has been and will be entitled to receive $90.00 per week in compensation benefits and $12.00 per week in dependency benefits. Exhibits 9 and 10. The plaintiff never gave notice to the defendant of the award of worker compensation benefits by the Industrial Accident Board.

In January, 1978, the defendant discontinued the payment of all benefits to the plaintiff under his Certificate of Insurance because the plaintiff was receiving Social Security benefits and worker's compensation benefits, and the total of these benefits exceeded $800.00 per month.

Social Security benefits received by the plaintiff are indicated in the middle column below, and benefits paid by the defendant (other than an added $400 during hospital confinement) are indicated in the column at the far right:

| Time Period | Monthly Social Security | Monthly Payments by Defendant |
| --- | --- | --- |
| October, 1974 – February, 1975 | | $800.00 |
| March, 1975 – June, 1975 | $390.90 | 800.00 |
| July, 1975 – June, 1976 | 422.20 | 377.80 |
| July, 1976 – June, 1977 | 442.10 [1] | 357.90 |
| July, 1977 – February, 1978 | 475.90 | 324.10 [2] |
| March, 1978 – December, 1978 | 475.90 | None |
| January, 1979 – unspecified | 506.90 | None |

## II.

At issue in this case are the validity and effect of coordination-of-benefits provisions, which appear both in a Schedule incorporated into the Master Policy and in typewritten portions of the Certificate of Insurance issued to the plaintiff. These provisions, and the definition of "income" immediately preceding them, are as follows:

1. The Statement of Agreed Facts, ¶ 13, states this figure as $499.30, but this appears to be a mistake; the next recitation is that in July, 1976, monthly benefits were *increased* to $475.90. The figure recited here is consistent with Exhibit 8.

2. This figure is not explicitly stated in the evidence. The court infers it from evidence of the practice of adjusting payments to the difference between $800 and Social Security benefits. The inference that February, 1978, is the last month for which payment in this amount was made is based on Exhibit 9, a letter from defendant, dated March 3, 1978, notifying plaintiff that benefits were being terminated because defendant had learned that plaintiff had been collecting worker compensation benefits retroactive to the date of the accident, at the rate of $102 per week.

THE TERM 'INCOME' SHALL MEAN THE MONTHLY EARNINGS THE INSURED EMPLOYEE RECEIVED FROM THE POLICYHOLDER IMMEDIATELY PRIOR TO THE DATE OF THE ACCIDENT OR COMMENCEMENT OF DISABILITY FROM SICKNESS EXCLUSIVE OF BONUSES, COMMISSIONS AND OVERTIME EARNINGS.

THE MONTHLY BENEFIT PROVIDED SHALL BE REDUCED BY ANY AMOUNTS PAID OR PAYABLE UNDER WORKMEN'S COMPENSATION, THE *PRIMARY TOTAL DISABILITY PROVISION OF THE FEDERAL SOCIAL SECURITY ACT, ANY EMPLOYER SPONSORED DISABILITY PLAN, THE DISABILITY PROVISIONS OF ANY EMPLOYER SPONSORED GROUP LIFE OR PENSION PLAN, OR ANY STATE OR STATUTORY ACT OR LAW.

*BENEFIT RELATING TO THE EMPLOYEE ONLY AND NOT INCLUDING ANY ADDITIONAL BENEFIT WHICH MIGHT BE PAYABLE BECAUSE OF THE PRESENCE OF DEPENDENTS.

The Certificate of Insurance was issued on a form partly printed, partly typed, and partly stamped. It is headed in very large letters, imprinted with a stamp, "MASS. STATE PHARMACEUTICAL ASSN. PLAN." Immediately under these stamped letters appears the typewritten name, "GROUP SERVICE CORP." Both of these names are in a space to the right of the printed word, "Policyholder." In the next lower line of the form is a blank headed "Insured Person," in which appears the typewritten name, "Stephen Kates."[3] The monthly accident benefit is stated to be

60 PER CENT OF INCOME SUBJECT TO A MAXIMUM OF $800.00. The Elimination Period is 30 days and the Maximum Benefit Period for accident is "LIFETIME." Immediately below these statements of the monthly benefit, the elimination period, and the maximum benefit period appear the typewritten definition of "income" and typewritten provisions on coordination of benefits, quoted above.

Plaintiff argues that the coordination-of-benefits provisions of the insurance contract on which this action is based are unenforceable because ambiguous and contrary to public policy.

In this diversity action, the law to be applied in resolving these questions is the law of Massachusetts.

---

**3.** The printed form used for applications under the MSPA endorsement states that the applicant is

> To Participate Under the M.S.P.A. Income Continuation Plan During Special Enrollment Period—(Participating Under the Group Service Corp. Plan for M.S.P.A. Members)

Following this statement is a blank for "Name of Member," which on plaintiff's application is filled in by handlettering, "PRESCRIPTION CENTER." Another set of blanks is preceded by the printed instruction: "List all members and employees you wish to be covered under this Plan. (Including yourself)." In these blanks appear, in handlettering, the names of Gerald Grocer and plaintiff (Stephen D. Kates). At the bottom of the form is a blank preceded by the printed phrase, "Signature of M.S.P.A. Member." This blank contains the handwritten signature of Gerald Grocer. The plaintiff was never an officer, director or employee of Group Service Corp. or the Massachusetts State Pharmaceutical Association, nor did he ever receive any income, salary or wages from either entity. Neither the plaintiff nor Prescription Center was a member of M.S.P.A., and Gerald Grocer, also not a member, was plaintiff's partner in the operation of Prescription Center. The names of plaintiff, Grocer, and Prescription Center came into the hands of the agent through access to the M.S.P.A. mailing list, which included pharmacists who were not members of M.S.P.A. In view of these facts, discrepancies may be noted between, on the one hand, the relationships existing among these persons and entities and, on the other hand, the ways these relationships were referred to in the Master Policy and the plaintiff's application and Certificate of Insurance. Because of the method of solicitation, the acceptance of premiums, and issuance of the Certificate of Insurance, however, it cannot reasonably be doubted that a contract providing some benefits to the plaintiff was in effect. Defendant's payment of benefits to plaintiff over a period of years manifests its understanding that a binding contract existed.

## III.

### A.

The first inquiry is whether ambiguity exists when the provisions of the Certificate are read along with those of the Master Policy.

In the basic coverage clause of the Master Policy the company "agrees . . . to pay benefits . . . subject to all the provisions, conditions, limitations and exceptions of this Policy." One of the provisions of the plaintiff's Certificate states clearly that the monthly benefit of $800 shall be reduced, first, by any amounts paid or payable under "WORKMEN'S COMPENSATION" and, second, by any amounts paid or payable under the "PRIMARY TOTAL DISABILITY PROVISION OF THE FEDERAL SOCIAL SECURITY ACT." One who knew the provisions of the Massachusetts worker compensation law and applied defendant's interpretation of this clause[4] could calculate that the first of these reductions, as applied to an employee with the earnings disclosed on plaintiff's application, would establish an offset of $102 per week (or approximately $442 per month) during a period of total disability resulting from an injury on the job covered by the worker compensation law. One who knew the provisions of the Social Security Act could calculate that the second of these reductions, as applied to an employee such as the plaintiff, would establish an offset (as of the time when plaintiff was injured) of $390.90 per month. Because the sum of these offsets exceeds the stipulated $800 monthly benefit, it is clear that (except during the second[5] through the sixth months of the waiting period before social security benefits become payable) plaintiff and all other insured employees similarly situated could never be entitled to any benefits under the accident coverage of the policy for an injury sustained at work and covered by worker compensation. Thus, rather than having coverage for "lifetime" monthly benefits for total disability resulting from on-the-job as well as off-the-job accidents, plaintiff and others similarly situated, for on-the-job accidents for which worker compensation benefits were payable,[6] had only five months coverage (at approximately half the $800 stated maximum, after reduction for worker compensation benefits) and no benefits at all thereafter.

Plaintiff argues ambiguity because "income," as used in the phrase "sixty percent of income subject to a maximum of $800," is defined to include only amounts an "insured employee" received "from the policyholder," and his employer was neither Group Service Corp. nor MSPA but Prescription Center. He argues that in these circumstances plaintiff could reasonably have read both the definition of income and the associated offset provisions as not applying to him. The argument proves too much. Without a showing of income in some sense, if not precisely the defined sense, 60% of nothing would be nothing; plaintiff would have no monthly benefit to be reduced. Quite reasonably plaintiff could have inferred that the definition of income was faulty because the agent chose

---

4. Plaintiff argues that the reference to worker compensation benefits is ambiguous because it does not define the types of benefits to which it applies, and they might include such things as benefits for dependents, medical expenses, disfigurement and loss of bodily function. The provision could not reasonably be read as ambiguous, however, with respect to whether it applied to the weekly indemnity for wage loss. The court need not address plaintiff's argument of ambiguity in other respects. Defendant made no deduction except as to the weekly indemnity of $90 and an additional $12 dependency allowance. Having so interpreted the clause, defendant has not and could not complain of the court's acceptance of this interpre-

tation. In light of the disposition of the case as explained in part V, *infra*, plaintiff is not adversely affected by this interpretation.

5. The first month is excluded by the 30-day elimination period.

6. Additional benefits might be provided by this insurance contract for injuries that, though occurring on the job, were excluded from worker compensation benefits. The value of this element of coverage would be insubstantial, however, in comparison with the value of benefits, if they were to be available, for injuries that were within the scope of the very broad coverage of worker compensation.

to use, for persons such as plaintiff (as well as the Pharmaceutical Association, persons and entities on its mailing list, and their employees), the same forms as were used for all the corporations and employees of corporations to whom coverage was extended under endorsements other than 13, 13–1, and 13–2. But that inference would not reasonably support the further inference that plaintiff's income from Prescription Center and his benefits from worker compensation and social security would therefore be irrelevant.

■ In summary, when read together with care by one who is fully informed regarding social security, worker compensation, and plaintiff's work and earnings, the provisions of the Master Policy and the Certificate unambiguously provide that plaintiff will receive only five months coverage, at a fraction of the maximum monthly benefit, for total disability from an on-the-job injury for which worker compensation benefits are payable.

### B.

The next inquiry concerns the validity of plaintiff's argument that the Certificate standing alone is ambiguous and that the Master Policy cannot be relied upon to resolve the ambiguity because plaintiff was not shown to have been given a copy. One version of the argument is that the Certificate unconditionally promises plaintiff "LIFETIME" benefits for total disability in one prominently positioned line but thereafter, if the coordination-of-benefits provisions are applied, reduces his benefits to zero commencing in the seventh month of disability, when the sum of his social security and worker compensation benefits exceeds $800. Thus, the argument goes, the Certificate is ambiguous because these declarations of the Certificate are mutually contradictory and neither is declared controlling over the other.

The conclusion of ambiguity depends fundamentally on treating the declaration of "LIFETIME" benefits as an unconditional declaration, rather than as one fairly to be read as subject to the conditions for reduc-tion of benefits stated immediately thereafter on the face of the Certificate.

■ Certainly in a context of bargaining between equals, it would be held that these clauses should be read together, the latter qualifying the former. It is equally clear, however, that many courts have effectively applied a more expansive concept of "ambiguity" when examining contracts of adhesion, and especially those offered by insurers. One question, then, for which guidance must be sought in precedents is whether this case falls within the concept of ambiguity as developed in Massachusetts law.

### C.

In *Slater v. U. S. Fidelity and Guaranty Co.*, —— Mass. ——, 400 N.E.2d 1256 (1980), plaintiff, an orthodontist, sued on an inland marine policy for loss totaling $9,000 from embezzlement of funds by a receptionist through a scheme or plan executed over a period of fifteen months, no single theft exceeding $250, the limit of policy coverage for loss sustained "in any one occurrence." "Occurrence" was not defined in the policy. Holding that coverage extended to the entire loss, the court declared:

> We believe that the use of the words "one occurrence" in the policy, without giving a definition or other aid to help determine the sense in which the words were used, gives rise to an ambiguity which must be construed against the insurer, who wrote the policy. *Massachusetts Turnpike Auth. v. Perini Corp.*, 349 Mass. 448, 454, 208 N.E.2d 807 (1965). *Vappi & Co. v. Aetna Cas. & Sur. Co.*, 348 Mass. 427, 431, 204 N.E.2d 273 (1965). Accord, *Saint Paul-Mercury Indem. Co. v. Rutland*, 225 F.2d 689, 691 (5th Cir. 1955); *Elston-Richards Storage Co. v. Indemnity Ins. Co.*, 194 F.Supp. 673, 679 (W.D.Mich. 1960), aff'd, 291 F.2d 627 (6th Cir. 1961); *Wilkinson & Son, Inc. v. Providence Wash. Ins. Co.*, 124 N.J.Super. 466, 469, 307 A.2d 639 (1973).

· · · · ·

Pursuant to our reading of analogous cases, and to the rule that ambiguities are

to be construed in favor of the insured, we hold that each act of embezzlement in this case was a separate "occurrence" within the meaning of the policy in question. Since the parties have agreed that none of the many separate thefts exceeded the liability limitation of $250, USF&G must pay the entire loss on each "occurrence," that total amount being $9,000. —— Mass. at ——, 400 N.E.2d at 1259, 1261–62.

As this passage and its citation of cases involving varied types of insurance disclose, Massachusetts is and long has been committed to the rule of resolving ambiguities in insurance contracts in favor of insureds. It is nevertheless debatable whether Massachusetts case law supports plaintiff's arguments for the application of this rule to the present case—the strongest of those arguments being that the certificate issued to the plaintiff is ambiguous because its promise of lifetime benefits is unconditional and therefore contradicts the coordination-of-benefits provisions that reduce benefits to zero after the sixth month. The parties have cited no Massachusetts case closely analogous to that at bar, and the court has found none. The most that can be said in support of the argument is that the rule of resolving ambiguities against the insurer is well established and often applied, and no case can be found that clearly indicates that it would not be applied to the relevant provisions of the Certificate in this case.

■ One who is genuinely searching for the meaning of a document containing two unconditional provisions, one immediately following the other, would favor a reading that reconciles them. Thus, if they produce conflict when both are read as unconditional statements but consistency when one is read as qualifying the other, the latter reading, if otherwise reasonable, would be favored. It is most reasonable to infer, even without resort to the Master Policy, that the coordination-of-benefits provision was meant to be a qualification of the promise of lifetime benefits. This reading is confirmed by the statement in the Master Policy that the company promises "to pay

... benefits ... subject to all the provisions, conditions, limitations and exceptions of this Policy." Reasonably interpreted, "provisions ... of this Policy" include all the conditions stated in the plaintiff's Certificate.

■ Literally no ambiguity exists when a qualifying clause clearly takes away what to an ordinary reader an eye-catching clause appears to give. The problem is not that the document is literally ambiguous but that it is effectively misleading.

■ Ambiguity in a document itself may, of course, be distinguished from ambiguity of communication. A document from which all ambiguity has been removed, by explicit qualifying clauses, may nevertheless communicate one meaning to the analyst of its network of clauses and a contrasting meaning to the ordinary reader. Contrasts between meanings communicated may be greater still if the reader must know facts beyond those stated in the document itself to grasp the full significance of its precisely chosen words. Thus, for example, clauses reducing benefits by the amounts of social security and worker compensation benefits will not be fully understood by one who lacks knowledge of either the facts needed to calculate these benefits or the rules by which they are calculated from those facts. For this reason, the coordination-of-benefits provisions of the Schedule and of plaintiff's Certificate fell far short of communicating clearly to the plaintiff and others similarly situated. Uncertainty remains, however, as to whether the concept of ambiguity developed in Massachusetts insurance cases extends not only to ambiguity of the insurance documents but as well to such lack of clarity of communication as this.

IV.

In view of uncertainty about how plaintiff's claims founded on alleged ambiguity should be resolved under Massachusetts law, it is necessary to consider plaintiff's alternative argument that the coordination-of-benefits provisions are unenforceable be-

cause contrary to public policy. Two aspects of Massachusetts law relating to coordination of benefits are easily determined and are addressed first.

### A.

■ No Massachusetts case has been cited by counsel, nor is the court aware of any, manifesting a public policy against coordination of benefits generally, or against such provisions regarding social security benefits or worker compensation benefits particularly. Moreover, the Supreme Judicial Court has explicitly approved coordination of benefits in a context that may be regarded as analogous. The case then before the court arose under Mass.Gen.Laws ch. 90, § 34A, which is part of Massachusetts' "no-fault" legislation. Section 34A includes a provision for coordination with benefits under the Massachusetts worker compensation law. Because that provision refers to the worker compensation law by chapter rather than in a more general way, it does not explicitly apply to benefits received under a federal worker compensation statute. In these circumstances the Supreme Judicial Court, by "fashion[ing] an adjunct to § 34A called for by the sense of that section in relation to the legislation as a whole," rather than by interpreting "the very language" of the statute, determined that the rule of coordination should be extended to federal as well as state worker compensation. *Mailhot v. Travelers Insurance Co.*, 375 Mass. 342, 377 N.E.2d 681, 684 (1978). It appears, then, that the public policy of Massachusetts allows coordination-of-benefits clauses when they do not transgress other public policies.

### B.

■ Effective in 1973, before the date of plaintiff's application for coverage, Massachusetts legislation, now carried forward in Mass.Gen.Laws ch. 175, § 110F,[7] declared:

> Benefits due under a policy of insurance insuring against disability from injury or disease shall not be reduced by an increase in federal social security benefits once payment of disability benefits has commenced.

Citing *Gopen v. American Supply Co.*, 1980 Mass.App.Ct.Adv.Sh. 1497, 1504, —— Mass.App. ——, 407 N.E.2d 1255, 1260 (1980) (the rule against retroactive application of statutes affecting substantive rights "takes on additional significance where ... relationships created by a contract antedating the statute are challenged"), defendant contends that to apply section 110F here would be to make a substantive change in a contract existing prior to enactment of the statute. *Gopen* is inapplicable to the present case, however. Even if contractual relationships among others had been established before the effective date of section 110F, no contractual relationship with plaintiff existed before his certificate was issued, and that event occurred after the effective date of section 110F.

■ By reason of section 110F and the factfindings stated in part I, *supra*, if the reduction because of social security benefits is applied in this case it will remain constant at $390.90 per month.[8] It is plainly implicit in the statute, however, that, subject to the prohibition against a further reduction once insurance benefits have become payable, coordination of disability insurance benefits with social security bene-

**7.** Initially this provision was added to Mass. Gen.Laws ch. 175, § 110A, *as a second sentence.* Mass. Acts 1973, ch. 550, approved July 27, 1973. Thereafter it was deleted from § 110A and enacted as a new § 110F. Mass. Acts 1974, ch. 470.

**8.** Defendant argues that plaintiff should be estopped from claiming a reduction less than $422.20 because plaintiff delayed reporting to defendant that he was receiving social security benefits, and they had already risen from $390.90 to $422.20 by that time. This argu-

ment is rejected. Information about the then-recent change in the level of social security benefits was publicly available. It was known, or should have been known, by defendant, as were later increases. Defendant reduced the payments even more when additional increases occurred. See part I *ante*. Having ignored its obligation under Mass.Gen.Laws ch. 175, § 110F, defendant is in no position to assert an estoppel against plaintiff's assertion of his rights under that statute.

fits is consistent with the public policy of Massachusetts.

### C.

The question remains whether other public policies are violated by the particular terms of the coordination-of-benefits provisions appearing in the contract at bar, as applied to the claim at bar.

### (1)

In *Slater,* p. 484 *ante,* the defendant insurer argued that the "all risk" inland marine policy issued to the plaintiff did not insure the fidelity of employees and that other types of insurance were available to cover embezzlement losses such as were proved in that case. The court responded:

> Language in an insurance policy must be given its ordinary meaning, however, and *construed in the sense that the insured will reasonably understand to be the scope of his coverage.* MacArthur v. Massachusetts Hosp. Serv., Inc., 343 Mass. 670, 672, 180 N.E.2d 449 (1962). *August A. Busch & Co. of Mass., Inc. v. Liberty Mut. Ins. Co.,* 339 Mass. 239, 243, 158 N.E.2d 351 (1959). *Panesis Loyal Protective Life Ins. Co.,* 5 Mass.App. 66, 359 N.E.2d 319 (1977). Had USF&G intended to exclude losses incurred by reason of embezzlement from the coverage of the policy, it "could have employed plain language so as to be readily understood." *Bates v. John Hancock Mut. Life Ins. Co.,* 6 Mass.App. 823, ——, 370 N.E.2d 1386, 1388 (1978). We hold, as did the Appeals Court, that the policy, reasonably construed, covered the insured's loss of money resulting from theft thereof by his employee.

—— Mass. at ——, 400 N.E.2d at 1258 (emphasis added; footnotes omitted).

A close reading of *Slater* and the cases it cites reveals two points relevant to the present inquiry. First, the rule that language in an insurance policy must be "construed in the sense that the insured will reasonably understand to be the scope of his coverage" is broadly applicable not only to the inland marine coverage at issue in *Slater* but also to other types of insurance coverages, including group health (*Panesis*) and motor vehicle liability (*August A. Busch & Co.*). Second, although the *Slater* opinion expresses this rule of construction in a way not explicitly limited to construing ambiguous provisions, elsewhere in the *Slater* opinion, and in each of the opinions it cites, one finds allusions to the rule that ambiguity is to be resolved against the insurer. Thus, it is historically the fact that the Massachusetts rule that the language in an insurance policy must be "construed in the sense that the insured will reasonably understand" developed in association with the rule that ambiguity is to be resolved against the insurer.

Also relevant is *Middlesex Ins. Co. v. American Emp. Ins. Co.,* —— Mass.App. ——, 400 N.E.2d 882 (Mass.App.1980), which focused on the effect a provision would have in sharply limiting coverage otherwise available under a policy. The issue was construction and enforceability of a clause within a garage liability policy purporting to exclude coverage for damage to premises wherein the garage was located. Affirming the trial court's judgment for coverage, the Appeals Court held:

> . . . We agree with the [trial] judge that to give the exclusionary clause the very broad and expansive reading suggested by the defendant reduces the property insured to such a narrowly circumscribed area as to be "unrealistically limited."

—— Mass.App. at ——, 400 N.E.2d at 883. The force of this holding as support for a rule of public policy applicable in the absence of ambiguity is weakened, however, by the fact that the court proceeded immediately to declare that "[i]n any event [the language at issue] is reasonably susceptible to varying readings, and is therefore ambiguous." *Id.*

In summary, Massachusetts case law plainly manifests public policies of construing insurance contracts "in the sense that the insured was reasonably given to understand was intended," and not in a way that produces "unrealistically limited" coverage, but case law alone provides at best only limited support for the conclusion that these public policies are applicable independently of ambiguity.

(2)

■ Apart from Mass.Gen.Laws ch. 175, § 110F, discussed in part IV–B, *ante*, a search of Massachusetts statutes and regulations discloses none directly applicable to this case. Massachusetts' decisional law establishes that it is nevertheless appropriate to look to statutes for guidance concerning relevant public policy of Massachusetts, and by analogy the same rule is applicable to administrative regulations issued under statutory authorization.

The Supreme Judicial Court of Massachusetts looks to statutes not only as mandates on issues directly addressed but also as sources of "establishment of policy [that] carries significance beyond the particular scope of each of the statutes involved." *Boston Housing Authority v. Hemingway*, 363 Mass. 184, 293 N.E.2d 831, 840 (1973), quoting *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), and citing Landis, *Statutes and the Sources of Law, Harvard Legal Essays* (1934), reprinted at 2 Harv.J.Legis. 7 (1965) (advocating recognition of statutes as sources for further development of decisional law).[9]

■ Although the insurance contract at issue here might be loosely referred to as a "group policy," it is clearly not within the scope either of "group marketing" or "mass merchandising"[10] regulated by Mass.Gen. Laws ch. 175, § 193R, which applies only to automobile and homeowner insurance. Nor is it within the scope of "group annuity" or "group life" policies regulated by Mass.Gen. Laws ch. 175, §§ 132A–132E and 133–138A respectively.

Individual accident and health policies are regulated by sections commencing with Mass.Gen.Laws ch. 175, § 108. Section 110 regulates "general" or "blanket" policies and declares that section 108 shall not "be construed to apply to or ·affect or prohibit the issue of any general or blanket policy of insurance" to an employer extending coverage to eligible employees.

Section 110E, enacted in 1973, approved on November 26, 1973, and as to which an emergency declaration was filed by the Governor November 27, 1973, making it effective immediately, contains relevant, though not directly applicable, expressions of public policy.

Section 110E provides, in pertinent part:

The commissioner shall make rules and regulations, and may at any time alter, amend, or make interpretations thereof, to establish minimum standards of full and fair disclosure, for the form and content of policies of accident and sickness insurance which provide medical surgical, or hospital expense benefits, whether on an indemnity, reimbursement, service or prepaid basis, as defined in section one hundred and eight .... Such rules and regulations may apply to all, any portion or reasonable classifications of such policies or contracts, and shall be made to bring about:

(a) reasonable standardization and simplification of coverages to facilitate understanding and comparisons;

---

**9.** *See also Mailhot, ante* p. 486; *Gaudette v. Webb*, 362 Mass. 60, 284 N.E.2d 222, 228–229 (1972) (right of recovery for wrongful death broader than explicitly directed by statutes).

**10.** Addressing the uncertainty about what constitutes "group marketing" and "mass merchandising" and whether regulations of "group marketing" apply also to "mass merchandising," the Commissioner of Insurance, in a preface to Rules and Regulations Regarding Insurance Issued Pursuant to a Group Marketing Plan, stated that Mass.Gen.Laws ch. 175, § 193R

can best be construed . . . as recognizing and continuing a distinction between "group marketing" and "mass merchandising." Each is

generically similar inasmuch as each is a technique for the sale of insurance to persons joined in certain groups. "Mass merchandising," however, contemplates the use of rates based entirely on anticipated lowered expenses flowing from the "mass" selling technique; whereas, "group marketing" contemplates those savings together with the possibility of further modifications based upon the actual experience of the group.

211 CMR 20.00, vol. 8 at 218. The commissioner therefore concluded that "mass merchandising" filings would be accepted without regard to the limitations regarding policy provisions appearing in section 193R.

(b) elimination of provisions which may be misleading or unreasonably confusing, in connection either with the purchase of such insurance or with the settlement of claims;

(c) elimination of deceptive practices in connection with the sale of such insurance;

(d) elimination of provisions which may be contrary to the health care needs of the public;

(e) elimination of coverages which are so limited in scope as to be of no substantial economic value to the holders thereof.

When a rule or regulation has been adopted pursuant to this section and an individual policy of accident and sickness insurance form regulated by section one hundred and eight is not in compliance with such rule or regulation, such noncompliance shall be grounds for a withdrawal of approval of such policy form and the commissioner may withdraw his approval of any such form upon written notice to the insurer specifying his reasons therefor. . . .

Among the regulations promulgated under the authority of section 110E are the following:

(14) No benefits can be reduced in coordination with any increased benefits that the insured may receive from the Social Security System after the effective date of the benefit period.[11]

. . . . .

(24) No policy shall limit or exclude coverages by type of illness, treatment, or medical condition if such limitations or exclusions are counter to the benefit standards set forth in this regulation. Illness, treatment of medical conditions arising out of war, intentionally self-inflicted injury or suicide, and aviation are considered to be justifiable limitations or exclusions.[12]

211 CMR 42.05

(4) *Accident, Accidental Injury, Accidental Means*, shall be defined to employ "result" language and shall not include words which establish an accidental means test or use words such as "external, violent, visible wounds" or similar words of description or characterization and shall not be more restrictive than the following: injury or injuries, for which benefits are provided, means accidental bodily injuries sustained by the insured person which are the direct and independent cause of the loss and occur while the insurance is in force. Such definition may be modified or *an exception or limitation* may be included to provide that injuries shall not include injuries for which benefits are provided under any *workmen's compensation*, employer's liability or similar law.

211 CMR 42.06. (Emphasis added.)

■ Despite the fact that section 110E and the commissioner's regulations thereunder are not directly applicable to this case,[13]

---

**11.** A statutory provision of identical import is discussed at p. 485 *ante.*

**12.** It may be noted that work-related injuries are not among those identified in this paragraph as "considered to be justifiable limitations or exclusions." However, the next paragraph quoted in the text above authorized "an exception or limitation" for injuries for which benefits are provided under worker compensation.

**13.** This conclusion is supported by the following factors: (1) section 110E's reference to section 108, (2) the provision of paragraph 8 of section 108 that section 108 shall not apply to "any blanket or group policy of insurance," (3) the provision of section 110 that section 108

shall not apply to "general" or "blanket" policies, (4) the declaration in the opening sentence of section 110E that it applies to "policies of accident and sickness insurance which provide medical, surgical, or hospital expense benefits . . . ," and (5) the likelihood that Massachusetts' regulatory authorities and courts would regard the policy at issue in this case as a "general" or "blanket" policy rather than an "individual policy" regulated by section 108, and would regard it as providing benefits other than "medical, surgical, or hospital benefits." The commissioner declared that his regulation issued to implement Mass.Gen.Laws ch. 175, § 110E, "shall apply to all *individual* accident and sickness insurance policies . . . ." 211 CMR 42.03 (emphasis added).

in the absence of grounds for distinction between "individual" and "general" or "blanket" policies, or between "medical, surgical, or hospital expense benefits" and other accident insurance benefits, that bear on needs for regulation such as section 110E addresses, a court may look to that section and the regulations promulgated thereunder for whatever guidance they may provide, by way of analogy, regarding the public policy of Massachusetts.

■ The last of the section 110E regulations quoted above, though using the terms "exception" and "limitation" rather than "reduction" or "coordination" of benefits, cannot fairly be read as opposing the conclusion that a provision coordinating accident insurance benefits with worker compensation benefits is consistent with the public policy of Massachusetts. Especially is this so in view of support for that conclusion elsewhere in the law of Massachusetts.[14]

The question remains whether the combined effect of the provisions regarding worker compensation benefits and social security benefits, as applied to cases like that now before this court, contravenes any manifest public policy of Massachusetts.

Section 110E contains an explicit legislative directive aimed at bringing about "elimination of coverages which are so limited in scope as to be of no substantial economic value to the holders thereof," "elimination of provisions which may be misleading or unreasonably confusing . . .," and "elimination of deceptive practices in connection with the sale of such insurance." Preceding these specific directives is a declared purpose of establishing "minimum standards of full and fair disclosure, for the form and content of the policies of accident and sickness insurance" to which section 110E applies directly.

These statutory directives do not in themselves provide an answer to the question presented in the case at bar. In the first place, as already noted, they were not directed to certificates of individual coverage under "blanket" or "general" policies. Second, even though establishing public policy of Massachusetts in relation to coverages that might be regarded as analogous, they do not speak to the imposition of liability as a means of promoting that public policy. Rather, they direct administrative action to promote and serve the public policy.

■ That the statutes did not speak to the type of insurance contract or to the form of relief at issue here, however, is not to be taken as a directive that the public policies expressed in the statute shall not be applied to a case such as this. Not speaking on this subject is more appropriately interpreted simply as not speaking, rather than as speaking negatively. *Cf. Mailhot, supra,* 375 Mass. at 348, 377 N.E.2d at 684.

These explicit statutory formulations are consistent with, and similar in content and spirit to the judicial expressions of public policy found in recent Massachusetts insurance cases, *ante*, that contracts of insurance should be "construed in the sense that the insured will reasonably understand to be the scope of his coverage," *Slater, supra,* and that an exclusionary clause should not be given such an expansive reading that it leaves only a coverage that is "unrealistically limited." *Middlesex, supra.*

## V.

■ The sources of authority examined in parts III and IV, *ante*, support two

14. Further support for this conclusion is found in *Mailhot,* discussed at p. 486 *ante.* Also *see* Mass.Gen.Laws ch. 152, § 46A, indicating that the *current* public policy of Massachusetts permits coordination of accident insurance and worker compensation benefits. This statute prescribes a special procedure by which, if an accident insurer has paid benefits for a loss later determined to be compensable under the worker compensation law and, for that reason, excludable from the accident insurer's obligation, the accident insurer may obtain reimbursement out of the proceeds of the worker compensation award or settlement. That statutory declaration, however, occurred after the certificate on which plaintiff sues was issued. The result reached by the court in the present case does not rest in any respect on this statute.

conclusions. First, one cannot say with assurance that Massachusetts courts would apply to the contract at issue in this case the doctrine of resolving ambiguities. Second, the law of Massachusetts discloses other public policies of insurance law that are relevant to the case at bar. These policies are that insurance contracts shall not be misleading and that coverages shall not be "unrealistically limited," or so limited in scope as to be of "no substantial economic value."[15]

What is the appropriate disposition of the case at bar in light of these public policies of Massachusetts insurance law?

### A.

Were the forms used by defendant in this case misleading, and was a relevant coverage "unrealistically limited" or "so limited in scope as to be of no substantial economic value" to the plaintiff? The answers depend in part on how broadly or narrowly a "coverage" is defined for this purpose. For example, if one looks to all the coverage plaintiff obtained under his certificate, one cannot say it was of no substantial economic value. If, on the other hand, it is appropriate to break down the total coverage into components and then examine each component separately, a different answer may be compelled. Thus, if one inquires whether "lifetime" coverage for total disability resulting from on-the-job accidental injuries had substantial economic value to *plaintiff*, surely the answer is no. As noted, part III–A *ante*, the most plaintiff could possibly recover would be five months' benefits (the second through sixth months of the waiting period before social security benefits commenced), and at only about half the $800 monthly benefit (because of the reduction on account of worker compensation benefits). In comparison with lifetime benefits of $800 per month, which one would envision when reading the typewritten state-

ments of maximum benefits and their duration, the coverage thus provided is, in this court's view, "unrealistically limited" and "of no substantial economic value" to the plaintiff.

 Is it appropriate, first, to examine components of the total coverage rather than asking these questions regarding substantial value in relation to the total policy only and, second, to carry that process of breaking the total coverage into components at least as far as is implicit in inquiring, in this case, about the value of lifetime coverage for disability resulting from on-the-job injuries? A review of both the policy provisions and the marketing method compels an affirmative response, and also compels the conclusion that, at least in the context of this marketing arrangement, the policy provisions were misleading.

As noted in part III, *ante*, the certificate issued to the plaintiff stated the maximum benefit period as "LIFETIME" and the maximum monthly benefit as:

 60 PER CENT OF INCOME SUBJECT TO A MAXIMUM OF $800.00. The Group Service Corp. policy was marketed through corporate employers in all instances other than the Massachusetts State Pharmaceutical Association, and in all instances to include coverage of employees (including employees of those on the mailing list of MSPA). In view of the marketing of this coverage through the workplace, employees electing to participate could reasonably expect to receive lifetime benefits if totally disabled from an injury sustained in the employment. Even though one who has all the relevant information about social security and worker compensation benefits could ascertain by close analysis of the coordination-of-benefits provisions that the coverage for on-the-job injuries would ordinarily be limited to a mere five months, and at approximately half the stated maximum of

---

**15.** Plaintiff argues, though without specific supporting citations, that "the reasonable expectations and understandings" of the plaintiff should be honored. In view of the conclusions reached in part V, it is unnecessary to consider whether the "reasonable expectations doc-

trine," explicitly recognized in a growing number of jurisdictions, is now a part of the insurance law of Massachusetts. *See Davenport Peters Co. v. Royal Globe Ins. Co.*, 490 F.Supp. 286 (D.Mass.1980).

$800 monthly, it would not be reasonable to expect that this fact would be discovered by a person who was considering whether to apply for participation. The problem, then, is not the certificate is ambiguous. Rather, the problem is that, as a practical matter, it was seriously misleading to those among whom it was marketed. The insurer, if it did not know this, certainly should have known it. Moreover, in addition to being misleading this provision produced a component of coverage—lifetime coverage for on-the-job injuries—of no substantial economic value to the plaintiff or to other employees of the participating companies similarly situated.[16] This conclusion seems most compatible with the general legislative objective manifest both in the first sentence of section 110E and in its specific implementation throughout the section. Also, this conclusion is supported by the textual reference to "elimination of *coverages* ... of no substantial economic value" (emphasis added) rather than elimination of policies of no substantial economic value. It is compatible, as well, with the general sense and spirit of the Massachusetts court decisions discussed in part IV–C *ante*.

■ In summary, taking guidance from legislative and regulatory directives for analogous coverages in the absence of guidance explicitly directed to the type of policy at issue in this case, the court concludes that the policy's provisions on coordination of benefits are offensive to the manifest public policy of Massachusetts and that it is consistent with judicial decisions of Massachusetts to decline to enforce them against an individual claimant rather than depending only on administrative enforcement of the declared public policy of the state on this question.

### B.

Plaintiff argues that the court should in these circumstances strike down the coordination-of-benefits clause in its entirety. Such a remedy, however, would run afoul of the clear manifestations of judicial, legislative and regulatory approval of fair and reasonable coordination-of-benefits clauses, including explicit manifestations of approval of coordination relating to social security benefits and worker compensation benefits. The offensiveness of the provisions at issue to the public policy of Massachusetts lies not in the subject matters they address but in the insubstantiality, after their combined impact is measured, of a prominently featured component of coverage. In this instance, the impact of either of these two provisions alone is almost the same, and the denial of enforcement of either provision cures the offensiveness to public policy resulting from their combined impact.[17]

■ In the circumstances of this case, it is appropriate to enforce the social security provision and deny enforcement of the worker compensation provision for several reasons. First, the provision regarding social security benefits is more clearly defined and appears in a statute directly applicable to this case, Mass.Gen.Laws ch. 175, § 110F. Second, this provision was applied initially by the defendant in making payments that were received and accepted by the plaintiff.

---

**16.** The court need not and does not consider whether the provisions would have remained too misleading to be enforced even if they had been modified to provide benefits of at least substantial economic value for lifetime disability resulting from on-the-job injury. In another context, a Massachusetts statute authorizes inclusion in individual accident policies of a provision establishing a minimum benefit of $200 per month where coordination-of-benefit clauses would reduce an otherwise larger benefit to an amount below $200. Mass.Gen.Laws ch. 175, § 108, paragraph 3(b)(6). A case very different from that now at bar would be presented if such a clause were in the certificate and the provision on monthly benefit were modified to read, for example: 60 PER CENT OF INCOME SUBJECT TO REDUCTION FOR OTHER BENEFITS AND SUBJECT TO A MAXIMUM OF $800 AND A MINIMUM OF $200.

**17.** Plaintiff would fare no better if the rule of resolving ambiguities against the insurer, part III ante, were applied to this case. Whether or not *Slater* is read as supporting coverage to the extent the insured "will reasonably understand," independently of ambiguity, it does not support coverage more expansive than that even when ambiguity exists.

Third, the misleading quality of the combined effect of the coordination-of-benefits provisions relates to on-the-job injuries for which worker compensation benefits are payable, and this factor takes on added significance because of the marketing of this coverage through the workplace.

For the foregoing reasons, the court, applying its best judgment as to applicable Massachusetts law, holds:

(1) Plaintiff has been and will be entitled to payment of benefits at the rate of $800 per month during the second through sixth months of disability and $409.10 per month thereafter for life.

(2) Plaintiff is entitled to judgment against the defendant on the counterclaim.

## VI.

In view of the rulings stated above, other issues argued in the submissions of the parties have become moot and are not addressed here.

## VII.

In accordance with Mass.Gen.Laws ch. 231, § 6C, each past due payment (or unpaid portion thereof) will bear interest at 8 per cent per annum from the date when due until the date of entry of judgment. Judgment will enter for the sum due as of the date of judgment, so calculated, and judgment will enter further that plaintiff is entitled to receive monthly payments in the future, after the date of judgment, at the rate of $409.10 per month for life. Judgment will enter for plaintiff on defendant's counterclaim.