## WILLIAM F. CODY *vs.* CONNECTICUT GENERAL LIFE INSURANCE CO.

Middlesex. March 3, 1982. — August 12, 1982.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Insurance. Contract*, Insurance, Coordination-of-benefits clause. *Public Policy.*

At the trial of an action against an insurance company by a person insured under a group contract of disability insurance, the judge was not required to submit the issue of damages to the jury where the amount of damages, if any, depended only on the interpretation of the contract and the enforceability of its coordination-of-benefits clause. [146-147]

The public policy of the Commonwealth, expressed in G. L. c. 175, § 110E, that insurance contracts not be misleading and that coverages not be unrealistically limited or so limited in scope as to be of no substantial economic value, did not preclude enforcement of the coordination-of-benefits clause of a group contract of disability insurance that took effect prior to the enactment of the statute. [147-149]

In future cases coordination-of-benefits clauses in group contracts of disability insurance will be examined in light of the public policy that insurance contracts not be misleading and that coverage may not be unrealistically limited or so limited in scope as to be of no substantial economic value. [149]

CIVIL ACTION commenced in the Superior Court on February 8, 1977.

The case was tried before *Murphy*, J., a District Court judge sitting under statutory authority.

The Supreme Judicial Court granted a request for direct appellate review.

*William H. Shaughnessy* for the plaintiff.

*Will J. Bangs (Larry C. Kenna* with him) for the defendant.

ABRAMS, J. We granted the parties' applications for direct appellate review to determine whether the public policy of this Commonwealth permits coordination-of-

benefits clauses in insurance contracts.[1] We conclude that coordination-of-benefits clauses do not violate the public policy of this Commonwealth unless the company engaged in misleading marketing practices, or the insurance contract as a whole is without substantial economic value.

We summarize the facts. The defendant Connecticut General Life Insurance Co. entered into a group contract of insurance with Sun Oil Company (Sun Oil), effective January 1, 1970. Under the contract, the defendant agreed to pay eligible Sun Oil employees who become totally disabled fifty percent of their base monthly earnings[2] up to $5,000 a month. The contract also contained two coordination-of-benefits clauses. The first clause provided that the benefits under the contract would be reduced by certain other income benefits, including workers' compensation, and fifty percent of the amount of the employee's primary Social Security benefits.[3] The second clause stated that if the sum of the employee's benefits under the contract, other income benefits,[4] and benefits from Social Security[5] exceeds

---

[1] Coordination-of-benefits clauses allow a company to deduct benefits from other sources from the benefits otherwise provided by the insurance contract.

[2] The term base monthly earnings means (a) with respect to each hourly employee, his hourly rate of pay multiplied by 174 hours; and (b) with respect to each salaried employee, his gross monthly salary excluding overtime, bonuses, commissions, and other remuneration.

[3] Before a disabled employee can receive any benefits under the contract, he must wait twenty-six weeks. Since the accident in this case occurred on March 1, 1971, the plaintiff was not eligible to receive any benefits before September 1, 1971.

[4] Other income benefits include any periodic cash payments on account of the employee's disability under (a) any employee sponsored group insurance coverage, toward which Sun Oil makes contributions, except benefits paid under scheduled injuries or permanent partial awards; (b) any State or Federal government disability or retirement plan; (c) any State or Federal workers' compensation or similar law, except benefits paid under scheduled injuries or permanent partial awards; (d) the maintenance provisions of the Jones Act, as applicable to seamen employed by Sun Oil.

[5] These Social Security benefits include benefits payable to the employee's dependents on account of the employee's disability.

seventy-five percent of the employee's base monthly earnings, the benefits under the contract would be reduced until the sum of all benefits equals seventy-five percent of the employee's base monthly earnings.

The plaintiff William F. Cody, an employee of Sun Oil, elected to purchase the coverage provided by this group contract. Through payroll deductions, the plaintiff paid a portion of the monthly premium for this coverage. The plaintiff never saw a copy of the insurance contract. The defendant did not distribute copies of the insurance contract to the employee-beneficiaries. Instead, the defendant sent a copy of the contract to Sun Oil. Sun Oil then distributed to its employees a booklet describing the benefits provided under the contract. The plaintiff testified that, after reading the booklet, he believed that he would receive seventy-five percent of his base pay in the event of a long term disability.[6]

As an employee, the plaintiff trained new tractor-trailer drivers for Sun Oil. On March 1, 1971, a driver trainee hit an obstruction on Route 95 in Groveland and lost control of the truck he was driving. The plaintiff, a passenger in that truck, was severely injured as a result of this accident. From the date of the accident until April 15, 1981, the date of the trial, the plaintiff had not worked. The plaintiff received no benefits under the contract.

In February, 1977, the plaintiff sued the defendant in the Superior Court. The plaintiff alleged a breach of the insurance contract by the defendant's failure to pay him any benefits.[7] At trial, the parties stipulated that the insurance

---

[6] The plaintiff may have based this belief on the coordination-of-benefits clause that provided that if benefits from all sources exceed seventy-five percent of the employee's base monthly earnings, the benefits under the contract will be reduced until benefits from all sources equal seventy-five percent of the employee's base monthly earnings.

[7] The plaintiff also sued the defendant for deceit. At the close of the plaintiff's evidence, the judge allowed the defendant's motion for a directed verdict on the deceit count. The plaintiff does not appeal this ruling. We deem the plaintiff's failure to claim that the judge erred in allowing the defendant's

contract controlled this action. The parties also stipulated that if the judge interpreted the contract to allow the defendant an offset for fifty percent of the plaintiff's primary Social Security benefits, plus the full amount of workers' compensation payments received between September 1, 1971, and April 15, 1981, the plaintiff would not be entitled to any payments under the contract; if the judge interpreted the contract to allow the defendant to offset only fifty percent of the plaintiff's primary Social Security benefits, the plaintiff would be entitled to $27,168.05 under the contract; if the judge interpreted the policy to allow no offsets at all, the plaintiff would be entitled to $52,402.70 under the contract.

The judge submitted to the jury two special verdict questions (see Mass. R. Civ. P. 49 [a], 365 Mass. 812 [1974]): (1) whether the plaintiff was disabled at any time after September 1, 1973,[8] and (2) if so, during what period of time. The jury found that the plaintiff was totally disabled from September 1, 1973, until April 21, 1981, the date of the verdict.

Over the plaintiff's objection, the judge determined the amount of damages himself. The judge found that under the insurance contract the plaintiff was entitled to recover fifty percent of his base monthly earnings reduced by his Massachusetts workers' compensation benefits and by fifty percent of his primary Social Security benefits. Since these offsets reduced the plaintiff's benefits under the insurance contract to nothing, the judge entered judgment for the defendant. We affirm the judgment.

The plaintiff appeals, claiming that the judge erred: (1) in failing to submit the issue of damages to the jury, and in entering judgment for the defendant; and (2) in enforcing the coordination-of-benefits clauses. We conclude that the

---

motion for a directed verdict on the deceit count as a waiver. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

[8] The defendant conceded that the plaintiff was disabled from the date of the accident until September 1, 1973.

judge correctly determined the question of damages himself. We also believe that the judge did not err in enforcing the coordination-of-benefits clauses contained in the contract. We add, however, that coordination-of-benefits clauses will no longer be enforced if they are misleading or if they render the insurance contract as a whole without substantial economic value.

1. *Damages.* The plaintiff claims that the judge erred in failing to submit the issue of damages to the jury, and in entering judgment for the defendant. We disagree.

The interpretation of an insurance contract is not a question of fact for the jury. *Biathrow* v. *Continental Cas. Co.*, 371 Mass. 249 (1976). See *Daley* v. *J.F. White Contracting Co.*, 347 Mass. 285, 288 (1964); *Hiller* v. *Submarine Signal Co.*, 325 Mass. 546, 549-550 (1950). The responsibility of construing the language of an insurance contract is a question of law for the trial judge, and then for the reviewing court. *Save-Mor Supermarkets, Inc.* v. *Skelly Detective Serv., Inc.*, 359 Mass. 221, 226 (1971).

When interpreting insurance contracts, courts are guided by several principles. Like all contracts, insurance contracts are to be construed "according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed." *MacArthur* v. *Massachusetts Hosp. Serv., Inc.*, 343 Mass. 670, 672 (1962), quoting *Koshland* v. *Columbia Ins. Co.*, 237 Mass. 467, 471 (1921). "A policy of insurance whose provisions are plainly and definitely expressed in appropriate language must be enforced in accordance with its terms." *Hyfer* v. *Metropolitan Life Ins. Co.*, 318 Mass. 175, 179 (1945), quoting *Stankus* v. *New York Life Ins. Co.*, 312 Mass. 366, 369 (1942). But, if the contract is ambiguous, "doubts as to the meaning of the words must be resolved against the insurance company that employed them and in favor of the insured." *August A. Busch & Co. of Mass., Inc.* v. *Liberty Mut. Ins. Co.*, 339 Mass. 239, 243 (1959). See *MacArthur* v. *Massachusetts Hosp. Serv., Inc.*, 343 Mass. 670, 672 (1962).

Consistent with these principles, the judge, rather than the jury, interpreted the insurance contract at issue in this case. The judge correctly concluded that the language of this contract was unambiguous.[9] Enforcing this contract according to its terms, the judge rightly determined that the plaintiff was entitled to fifty percent of his base monthly earnings reduced by the offset for Social Security and workers' compensation.[10]

In addition, the parties stipulated to the amount of damages that the plaintiff could receive under each possible interpretation of the contract. After this stipulation, the only disputed issues involved the plaintiff's disability. Pursuant to Mass. R. Civ. P. 49 (a), 365 Mass. 812 (1974), the judge required the jury to return a special verdict on every issue of fact in dispute. Once the jury determined that the plaintiff had been totally disabled from September 1, 1973, to April 21, 1981, there were no other disputed factual issues for the jury to decide. Thereafter, the judge merely had to apply the law to the facts as found by the jury and as stipulated to by the parties. Specifically, he had to select, from the damage calculations to which the parties had stipulated, that calculation which was consistent with his interpretation of the contract. In line with his construction of the contract, the judge determined that the plaintiff was entitled to nothing under the contract. We therefore conclude that the judge properly entered judgment for the defendant.

---

[9] The plaintiff's testimony that he thought he would receive seventy-five percent of his base monthly earnings in the event of a long term disability does not create an ambiguity in the contract. See *Dekofski* v. *Leite*, 336 Mass. 127, 129 (1957).

[10] The second coordination-of-benefits clause contained in the contract provides that if benefits from all sources exceed seventy-five percent of the employee's base monthly earnings, benefits under the contract will be reduced until benefits from all sources equal seventy-five percent of the employee's base monthly earnings. This clause operates as a ceiling on the benefits provided under the contract. Since the offsets for Social Security and workers' compensation under the first coordination-of-benefits clause reduced the benefits provided under the policy to nothing, the second coordination-of-benefits clause did not operate in this case.

2. *Coordination-of-benefits clauses.* Relying on *Kates* v. *St. Paul Fire & Marine Ins. Co.*, 509 F. Supp. 477 (D. Mass. 1981), the plaintiff claims that the judge erred in enforcing the coordination-of-benefits clauses, because they violate public policy. We agree with the plaintiff that *Kates* v. *St. Paul Fire & Marine Ins. Co.*, *supra* at 491, correctly states the public policy of this Commonwealth, that insurance contracts may not be misleading, and that coverages may not be "unrealistically limited" or so limited in scope as to be of no "substantial economic value." However, in this case, the insurance contract took effect, and the plaintiff's injury occurred, before the Legislature enacted the statutes that are the source of this public policy. We therefore believe that it would be unfair to apply this public policy in this case.

In the *Kates* case, *supra*, the judge correctly found one source of this public policy in G. L. c. 175, § 110E.[11] Pursuant to G. L. c. 175, § 110E, inserted by St. 1973, c. 1081, the Commissioner of Insurance may issue rules and regulations "to establish minimum standards of full and fair disclosure, for the form and content of policies of accident and sickness insurance which provide medical, surgical, or hospital expense benefits . . . ." Among the purposes of these rules and regulations are the "elimination of provisions which may be misleading . . ."; and the "elimination of coverages which are so limited in scope as to be of no substantial economic value." G. L. c. 175, § 110E (*b*) (*e*). Although G. L. c. 175, § 110E, expressly does not cover "general" or "blanket" disability insurance contracts like that at issue in this case, the *Kates* decision properly determined that the policies set out in that statute apply to such

---

[11] There are other statutory sources for this policy. For example, G. L. c. 93A, § 2, inserted by St. 1967, c. 813, § 1, prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," including insurance. See *Dodd* v. *Commercial Union Ins. Co.*, 373 Mass. 72, 75-76 (1977). In addition, the Commissioner of Insurance must make sure that insurance policies are readable. See G. L. c. 175, § 2B, inserted by St. 1977, c. 801, § 1.

contracts. Cf. *Mailhot* v. *Travelers Ins. Co.*, 375 Mass. 342, 348 & n.7 (1978); *Gaudette* v. *Webb*, 362 Mass. 60, 70 (1972). Since G. L. c. 175, § 110E, was enacted after the effective date of the insurance contract at issue in this case, and after the injury giving rise to this claim,[12] we believe it would be unfair to apply the public policy set out in that statute.

However, we think it is appropriate to elaborate on this policy for future cases. In the *Kates* case, the insurance contract clearly provided that payments on account of workers' compensation and Social Security would be deducted from the benefits provided by the policy. Nevertheless, the judge concluded that the contract was misleading. "In view of the marketing of this coverage through the workplace, employees electing to participate could reasonably expect to receive lifetime benefits if totally disabled from an injury sustained in their employment. Even though one who has all the relevant information about social security and worker compensation benefits could ascertain by close analysis of the coordination-of-benefits provisions that . . . [under the policy he would receive few benefits for on-the-job injuries], it would not be reasonable to expect that this fact would be discovered by a person who was considering whether to apply for participation."[13] *Id.* at 491-492. Thus, the *Kates* case demonstrates that a company's marketing techniques may make even a totally unambiguous insurance contract misleading.[14] Since mislead-

---

[12] The insurance contract in this case took effect in 1970 — three years before the enactment of G. L. c. 175, § 110E. The injury on which this claim is based occurred two years prior to the enactment of G. L. c. 175, § 110E.

[13] To avoid a claim that an insurance contract like that at issue in this case is misleading, a company should specifically inform the consumer that because of the coordination-of-benefits clauses, he may not be entitled to any benefits under the policy for certain injuries. We emphasize that a clear warning prevents an insurance contract from being misleading.

[14] Because of the importance of marketing methods, courts relax the parol evidence rule to admit evidence of oral or written assurances made

ing insurance contracts violate the public policy of this Commonwealth, we believe that courts must limit the enforcement of these contracts to avoid unconscionable results. Cf. *Zapatha* v. *Dairy Mart, Inc.*, 381 Mass. 284, 293 (1980); *Commonwealth* v. *DeCotis*, 366 Mass. 234, 242 (1974); *Lechmere Tire & Sales Co.* v. *Burwick*, 360 Mass. 718, 720-721 (1972).

If the insurance contract is not misleading, we think that the court must go on to decide whether the contract as a whole is without substantial economic value.[15] The deter-

---

by the agent who sells the policy. See 7 Williston, Contracts § 900, at 32-33 (3d ed. 1963), and cases cited. See also K.B. Hughes, Evidence, § 423 (1961), and cases cited; *Adzigian* v. *WORL Broadcasting Corp.*, 348 Mass. 777 (1964); *Tri-City Concrete Co.* v. *A.L.A. Constr. Co.*, 343 Mass. 425 (1962).

At trial, the judge did not fully consider the defendant's marketing practices. He excluded the benefits booklet distributed by Sun Oil to its employees. We believe that the booklet is relevant to the issue whether the contract is misleading. But since we have concluded that the policies set out in *Kates* do not apply to this case, we need not decide whether the exclusion of the booklet is an error that requires reversal.

In marketing this contract, the defendant did not make its policies available to the employee-beneficiaries. Instead, the defendant relied on Sun Oil to inform the employees about the benefits under the policy. The defendant chose this marketing technique and is therefore bound by the benefits booklet distributed by Sun Oil. Thus, if the question whether the contract is misleading were an issue in this case, the judge should admit the benefits booklet.

Further, in this case Sun Oil distributed the booklet in 1964, seven years before the plaintiff's disability. The record does not indicate that the defendant ever lodged an objection to the content of the booklet. In addition, the booklet described the policy so precisely that a reasonable person could conclude that someone from the insurance company prepared it. Since the probability is very high that the defendant at least tacitly approved the benefits booklet distributed by Sun Oil (cf. *Smith* v. *Ariens Co.*, 375 Mass. 620, 622 [1978]), it would not be unfair to hold the defendant to the terms of the booklet. Unless there were evidence that the defendant asked the employer to withdraw the booklet or to correct it, the judge should assume that the defendant acquiesced in its distribution.

[15] In *Kates* v. *St. Paul Fire & Marine Ins. Co.*, 509 F. Supp. 477, 491-492 (D. Mass. 1981), the judge held that the insurance contract violated public policy, although only one component of the contract, coverage for on-the-job injuries, was without substantial economic value. The judge reached the result because he concluded that the insurance contract was misleading.

mination whether the contract is without substantial economic value is similar to an examination of the substantive unconscionability of a contract. A court must determine whether the contract terms are unreasonably favorable to one party. See *Zapatha* v. *Dairy Mart, Inc.*, 381 Mass. 284, 293-294 & n.13 (1980). Hence, a court should find that an insurance contract like that at issue in this case has substantial economic value as long as the premiums reflect the anticipated effect of any coordination-of-benefits clause.

Finally, we note that coordination-of-benefits clauses serve the public purpose of avoiding duplicate recoveries for the same injuries. *Mailhot* v. *Travelers Ins. Co.*, 375 Mass. 342, 347-348 (1978). These clauses enable insurance companies to charge lower premiums.[16] See *Lamb* v. *Connecticut Gen. Life Ins. Co.*, 643 F.2d 108, 109 n.1 (3d Cir. 1981); *Connecticut Gen. Life Ins. Co.* v. *Craton*, 405 F.2d 41, 47 (5th Cir. 1968). We therefore conclude that unless a company engages in misleading marketing practices, or an insurance contract as a whole is without substantial economic value, coordination-of-benefits clauses do not violate the public policy of this Commonwealth.

*Judgment affirmed.*

---

[16] The benefits from programs such as workers' compensation and Social Security "can to some extent be actuarially related to the risks the company must take and hence to the premiums it must charge." *Connecticut Gen. Life Ins. Co.* v. *Craton*, 405 F.2d 41, 47 (5th Cir. 1968).