Botsford, J.
INTRODUCTION
On August 18, 1994, the plaintiff Millipore Corporation (“Millipore”) sold one of its divisions employing approximately one-third of its- 5,800 employees to the defendant Waters Holding, Inc. (“Waters”) for $335,000,000. In the amended and restated purchase and sale agreement between the parties (“the agreement"), Waters agreed to create certain replacement retirement plans for the Millipore employees who would be transferred to Waters as part of the sale, and Millipore agreed to transfer assets associated with the transferred employees from the existing Millipore employee retirement plans to the Waters replacement plans. Millipore has brought this declaratory judgment action to resolve a dispute over the method of calculating the amount of assets to be transferred under §8.8(iv) of the agreement from one of Millipore’s employee retirement plans. The parties are now before the court on cross-motions for summary judgment.
Millipore moves for summary judgment oh its claims that: (1) under the unambiguous provisions of §8.8(iv) of the agreement, the amount to be transferred from the Millipore defined benefit retirement plan must be calculated employing the actuarial assumptions used in the January 1, 1994 “determination of pension expense valuation report” prepared by the Wyatt Company; and, (2) that calculation having been made, the transfer by Millipore of $1,940,998.98 to Waters would fully satisfy Millipore’s transfer obligations under §8.8(iv).
Waters opposes Millipore’s motion, and in its cross-motion for summary judgment seeks to establish that: (1) §8.8(iv) of the agreement unambiguously requires that the amount to be transferred from the Millipore defined benefit retirement plan to the relevant Waters replacement plan must satisfy the Financial Accounting Standards Board Statement No. 87 (“FAS 87”); and (2) the parties’ dispute over the amount to transfer is arbitrable pursuant to §12.10(a) of the agreement, and accordingly must be arbitrated rather than decided by this court. In the alternative, Waters moves for an order staying these proceedings until certain related issues concerning the application of the Federal Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1001 et seq., can be resolved in an action Waters has filed in the Federal District Court.
For the reasons discussed below, Millipore’s motion for summary judgment is allowed, and Waters’ cross-motion for summary judgment is denied. Waters’ request for a stay is also denied.
BACKGROUND
The summary judgment record reveals the following; the facts stated are undisputed unless otherwise noted.
Millipore is a corporation which develops, manufactures and markets products for fluid analysis, identi *684 fication and purification through the use of separations technology. In 1980, Millipore acquired Waters Associates, Inc., a company engaged in chromatography separation technologies, and operated this business as the Waters Division of Millipore until August 18, 1994.
For many years and at least since 1980, Millipore has maintained a defined contribution profit-sharing plan for its United States employees, known as the Millipore “participation plan.” In 1980, Millipore also created a defined benefit plan, known as the Millipore “retirement plan." (The two plans are collectively referred to as the “employee retirement plans.”) The retirement plan, which operates as a so-called ’’floor-plan," is designed to provide a guaranteed minimum retirement benefit for each participant. Under the combined operation of the two Millipore employee retirement plans, in the event a participant’s account balance in the participation plan is not large enough to provide the actuarial equivalent of the minimum benefit called for by the retirement plan, the participant will receive an additional benefit from the retirement plan in order to achieve the guaranteed minimum benefit.
Participants in the Millipore employee retirement plans who retire have had the option of either taking their participation plan balance as a lump sum, or of transferring their participation plan balance to the retirement plan and taking a monthly annuity from the retirement plan. In 1986, Millipore amended its employee retirement plans to provide for early retirement benefits for eligible participants. For employees who retire at age 62 or later (but before the normal retirement age of 65), the amount of the retirement benefit is payable in full, although based on years of service as of the time of retirement rather than as of age 65. The form of payment — a lump sum distribution from the participation plan account balance or a monthly annuity from the retirement plan after transfer of the participation plan balance to the retirement plan — is the same as for employees who opt for “normal” retirement at 65.
From at least 1991, the Wyatt Company (“Wyatt”), an independent actuarial firm, has examined the Millipore employee retirement plans and has prepared annual valuation reports for Millipore. In preparing the January 1, 1994 valuation of the Millipore retirement plan (“the 1994 Wyatt valuation report," or “the 1994 Wyatt report”)[1] Wyatt considered, among other factors, the effect of the early retirement provisions of the Millipore employee retirement plans and the provisions allowing participants the option of transferring their participation plan account balance to the retirement plan. In particular, Wyatt explicitly assumed for purposes of its valuation that no Millipore employee would transfer his or her participation plan account balance to the retirement plan, and that everyone would retire early, at age 62.[2]
In March 1994, Millipore entered into negotiations with the venture capital firms AEA Investors, Inc. and Bain Capital, Inc. for the sale of the Waters Division of Millipore. These negotiations culminated in a $335,000,000 transaction whereby Waters, a newly formed corporation, acquired substantially all of the assets and liabilities of Millipore’s chromatography division with financing from AEA Investors and Bain. In these negotiations, each side was represented and advised by legal counsel, investment bankers, accountants, and actuaries. The deal reached in these negotiations is set forth in the agreement.
Before the closing of the purchase and sale transaction on August 18, 1994, Waters and its actuary, the firm of Towers Perrin, were provided with copies of the 1994 Wyatt valuation report as well as Millipore’s retirement plan and participation plan. Towers Perrin understood the combined effect of the early retirement provision and the transfer provision in those plans before the closing took place, although Towers Perrin states that it did not become aware “that no explicit provision was made to assign a value to the transfer provision” until later. (Affidavit of Marcus Rafiee, May 16, 1996,13.)
As indicated at the outset, the transaction involved the transfer of many employees. Under the terms of the agreement, Millipore agreed to transfer to Waters certain amounts from Millipore’s participation plan and retirement plan for the benefit of the employees being transferred; these transferred amounts were to be placed in replacement participation and defined benefit plans[3] that Waters in turn agreed to create. In particular, Millipore agreed to transfer the accrued account balances of all the transferred employees in the participation plan (agreement, §8.8(v)), and also agreed to transfer the “projected benefit obligation” (PBO) of the retirement plan associated with the transferred employees (agreement, §8.8(iv)). The PBO represents an actuarial present value estimate of the potential future obligations of a defined benefit plan, based on certain actuarial assumptions used in arriving at the estimate.
Pursuant to §8.8(iv) of the agreement, on or about March 10, 1995, Wyatt performed a calculation of the PBO attributable to the transferred employees. Wyatt used the actuarial assumptions set forth in the 1994 Wyatt valuation report; it also used, as specified in §8.8(iv), the annual interest rate of 7% and the date of September 30, 1994, which was the next quarterly valuation date following the agreement’s closing date of August 18. Wyatt determined that the PBO, and thus the amount to be transferred from the Millipore retirement plan to the Waters replacement defined benefit plan, was $ 1,890,328.00. Wyatt then delivered this calculation, with supporting data, to Millipore and to Towers Perrin.
Towers Perrin, Waters’ independent actuarial firm, thereafter calculated the PBO on the basis of the *685 actuarial assumptions in the Wyatt valuation report and the Millipore retirement plan provisions of which Towers Perrin was aware. Without agreeing that the calculation is the one called for by the agreement, Marcus Rafiee, the Towers Perrin actuary who performed the calculation, arrived at the figure of $1,940,998.98; the difference between the two calculations was thus approximately $50,000.00.
On June 28, 1995, Waters delivered to Millipore a letter asserting that the 1994 Wyatt valuation report was flawed and that Millipore had failed to value the liabilities of the Millipore retirement plan accurately or reasonably under Financial Accounting Standards Board Statement No. 87 (FAS 87).[4] On August 17, 1994, Waters filed a demand for arbitration with the American Arbitration Association (“AAA") pursuant to §12.10 of the agreement, claiming that the amount properly to be transferred to it from Millipore’s retirement plan could be as much as $11,000,000.[5] After a hearing, in an order dated December 5, 1995, a judge of this court (White, J.) issued a preliminary injunction staying the arbitration proceeding.
DISCUSSION
Summary judgment is appropriate where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a triable issue and that the summary judgment record entitles it to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Id. at 17.
I. Millipore’s Motion for Summary Judgment
At issue in this case is Millipore’s obligation to transfer assets in amounts equal to the PBO of the retirement plan attributable to the transferred employees. The provision of the agreement relevant to this issue, §8.8(iv), provides as follows:
The amount of assets to be transferred from the [Millipore] Retirement Plan shall be equal to the Projected Benefit Obligation (“PBO"), whether or not vested, as determined in accordance with the Financial Accounting Standards Board Statement 87 (“FAS 87") and which is attributable to the Transferred Employees who are participants in the Retirement Plan as of the Closing Date [of the agreement]. For purposes of the preceding sentence, determinations of the PBO shall be calculated in accordance with the actuarial assumptions set forth in the January 1, 1994 determination of pension expense valuation report prepared by the Wyatt Company[6] using the Participation Plan balances as of the quarterly valuation date next following the Closing Date and an annual interest rate of 7%. The above described calculation of the amount to be transferred from the [Waters] Retirement Plan to the Replacement Retirement Defined Benefit Plan shall be made by the Wyatt Company and, at [Waters’] option, reviewed by Towers Perrin. In the event these two actuarial firms cannot agree on an amount to be transferred hereunder, a third, independent, actuarial firm acceptable to both Millipore and [Waters] will be engaged and the decision of such firm shall be binding. Millipore and [Waters] will equally share the cost incurred for the third actuary.
(Emphasis supplied.)
Millipore argues that the language used in §8.8(iv) is unambiguous, and that the court should give the language its full effect. In Millipore’s view, this means that the amount it is to transfer to Waters for the replacement defined benefit plan must be calculated both in accordance with the financial reporting and accounting standards set out in FAS 87, and by using the actuarial assumptions contained in the 1994 Wyatt valuation report. Millipore contends that these two contractual requirements may both be honored because the way they are placed together in §8.8(iv) indicates an implicit agreement by the parties that the assumptions in the 1994 Wyatt valuation report do comply with FAS 87. Put another way, Millipore argues that the second sentence, specifically directing that calculation of the PBO is to be done using the 1994 Wyatt valuation report’s assumptions, should be read as qualifying and particularizing the first, more general mandate to determine the PBO in accordance with FAS 87.
Waters does not appear to contest the claim that §8.8(iv) is unambiguous; it simply argues that Millipore misreads the section’s plain meaning. Waters asserts that the way to harmonize the two separate mandates set forth in the section is to read them as calling for use of the 1994 Wyatt valuation report’s actuarial assumptions, “so long as they yield a result that is in compliance with FAS 87.” (Waters’ memorandum in opposition to plaintiffs motion for summary judgment [Waters mem.], p. 16.) Thus, Waters argues, the critical factual question raised at the threshold by this case, and the one which presumably precludes summary judgment in Millipore’s favor, is whether the 1994 Wyatt valuation reports assumptions do satisfy FAS 87. (Waters mem., p. 13 n. 5.)
A contract should be construed so that all provisions are consistent with one another, see, e.g., Henry B. Byors & Sons, Inc. v. Board of Water Comm'rs of Northborough, 358 Mass. 354, 363 (1970); MacDonald v. Hawker, 11 Mass.App.Ct. 869, 873 (1981), and not in a manner which renders any provision of the agreement meaningless. See, e.g., Gibraltar Fin. Corp. v. *686 Lumbermens Mut. Cas. Co., 400 Mass. 870, 872 (1987) (“tut is a standard rule of construction that interpretations which result in meaningless words are to be avoided”). Moreover, proper interpretation of a contract is one which appears to be in accord with justice, common sense and the probable intention of the parties. Stop & Shop, Inc. v. Ganem, 347 Mass. 697, 701 (1964); Bowser v. Chalifour, 334 Mass. 348, 352 (1956). See USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116, further app. rev. denied, 406 Mass. 1104 (1989) (contract is to be interpreted “as a whole, in a reasonable and practical way, consistent with its language, background, and purpose"). The reading of the agreement advanced by Millipore best satisfies these rules of construction.
As both parties agree, the critical provisions in §8.8(iv) set out two requirements for the determination of the PBO: that it is to comply with FAS 87, and that it is to be calculated using the actuarial assumptions in the 1997 Wyatt valuation report. But the section also indicates that these mandates should not be read as completely distinct and possibly conflicting conditions. To do so would ignore the phrase that introduces the second mandate, viz., “[flor purposes of the preceding sentence determinations of the PBO shall be calculated [using the 1994 Wyatt report’s actuarial assumptions].” This language clearly signals that the two conditions are linked, and that, as Millipore argues, implicit in the linkage is a premise that the actuarial assumptions in the 1994 Wyatt valuation report do comply with FAS 87. See Kates v. St. Paul Fire & Marine Ins. Co., 509 F.Supp. 477, 485 (D.Mass. 1981) (”[o]ne who is genuinely searching for the meaning of a document containing two unconditional provisions, one immediately following the other, would favor a reading that reconciles them. Thus, if they produce conflict when both are read as unconditional statements, but consistency when one is read as qualifying the other, the latter reading, if otherwise reasonable, would be favored”). If this were not the premise — if the mandate in the second sentence to use the assumptions in the 1994 Wyatt valuation report were independent of the requirement to comply with FAS 87 in the first — the two sentences together would have little practical value or meaning, for at least two reasons. First, an inquiry into whether the actuarial assumptions in the 1994 Wyatt report did in fact comply with FAS 87 would be a prerequisite to the determination of the PBO amount and resulting amount of assets to transfer, a point discussed below. Second, if the factual inquiry were made and the parties did not agree that the 1994 actuarial assumptions complied with FAS 87, then one of the two sentences in §8.8(iv) would have to be ignored to permit the determination of the asset transfer amount to go forward: either the PBO calculation would be made using actuarial assumptions different from those in the 1994 Wyatt report but ones that the parties agreed did comply with FAS 87;[7] or the calculation would be made using the 1994 Wyatt report’s actuarial assumptions, even though the parties (or at least one party) had determined that this would not be in accordance with FAS 87. By definition, a construction of the agreement which necessitates that one of its key provisions be ignored is not one which gives meaning to all the agreement’s provisions, and thus it should be avoided. Gibraltar Fin’l Corp. v. Lumbermens Mut. Cas. Co., supra, 400 Mass. at 872.
Furthermore, the interpretation advanced by Millipore is the one that clearly best carries out the purpose and intention of the parties, as they may be discerned from the agreement itself. Section 8.8 (iv), with its two sentences describing the method of determining the PBO, suggests a purpose of setting out specific directions for making the calculation so that the amount of the PBO and therefore of the asset transfer could be determined directly and efficiently. Waters’ proffered interpretation, which impliedly requires (or at least contemplates) that the parties first determine whether the assumptions in the 1994 Wyatt report complied with FAS 87 before doing the PBO calculation, introduces into the agreement a lengthy and potentially contentious process whose outcome is unknown. This seems contrary to the intention of the parties as expressed by their contractual language[8] and as supported by their words after the fact. (See, e.g., affidavit of Jeffrey Stevenson in opposition to plaintiffs’ motion for summary judgment [Stevenson aff.], 5; Hansen dep. p. 71.)
Waters argues that if it had known before the agreement was executed what it claims to know now, namely, that the 1994 Wyatt valuation report’s actuarial assumptions do not meet the standards of FAS 87, it never would have agreed to use those assumptions in the agreement. (See Stevenson aff., 5.)[9] This contention is beside the point. The issue here is determining what the agreement states and means, and as the discussion above indicates, the agreement states in clear terms that the 1994 Wyatt report assumptions are to be used. Waters’ complaint that it did not correctly understand the effect of assumptions may seek to suggest that the agreement is perhaps premised on a mistake of fact, but Waters does not directly make this argument, and in the circumstances presented it could not. In negotiating and ultimately entering into the agreement, both Millipore and Waters were represented and advised by legal counsel, accountants and actuaries. Waters and its actuaries were provided with copies of the Millipore retirement plan, the 1994 Wyatt valuation report, and other documents concerning them during the process. Waters also acknowledges that Towers Perrin, Waters’ actuary, understood the effect of the early retirement provision and the transfer provision on the retirement plan before the agreement was signed. Moreover, the chief executive officer and chief financial officer of Waters had held positions as officers of Millipore prior to the purchase and sale transaction — one was chief *687 financial officer and one was controller. In those positions, the officers would have had knowledge of how the Millipore employee retirement plans worked and were valued. Finally, no one disputes that when the Towers Perrin actuaries undertook to calculate the PBO using the assumptions in the 1994 Wyatt report, they were able to do so because they could derive from the report all the relevant assumptions that Wyatt had used.[10] Waters therefore had all the means necessary at its disposal before the agreement was signed to identify, and investigate the validity of, the actuarial assumptions which Wyatt had used in its 1994 valuation report. That Waters now disagrees with Millipore about whether the assumptions used in the 1994 Wyatt report satisfy FAS 87 does not change the fact that in §8.8(iv) of the agreement, the parties did commit themselves to an understanding that use of 1994 Wyatt report’s assumptions would be in compliance with FAS 87.[11]
Waters asserts that Millipore’s reading of the agreement makes the first sentence of §8.8(iv) superfluous; that if the actuarial assumptions in the 1994 Wyatt valuation report were to govern the calculation of the PBO in all circumstances, there was no need to state separately in the agreement that the PBO determination must accord with FAS 87. I disagree. FAS 87 is a lengthy document, setting out a range of requirements for accounting and reporting pension costs in employer financial statements. It does, however, deal specifically with the term “projected benefit obligation” (PBO), and as the text of FAS 87 indicates, it provides a method — of which the PBO is an integral part — for valuing and accounting for pension cost and obligations that is different from other possible methods of valuing pension plan liabilities. (See also Hansen dep., p. 72.) The reference in the agreement to FAS 87 is reasonably interpreted as indicating that the overall method for determining Millipore’s retirement plan funding liability and the amount it would be obligated to transfer to Waters, was to be the methodology set out in FAS 87. The specific actuarial assumptions which would be used in doing the calculation according to the FAS 87 accounting methodology, however, are something different. FAS 87 does not set out any specific actuarial assumptions. See FAS 87, ¶87.10 (the standards are “intended to specify accounting objectives and results rather than specific computational means of obtaining those results”). Thus, the second sentence in §8.8(iv), directing the use of the assumptions in the 1994 Wyatt report, adds to the agreement a particularization that FAS 87 itself does not give.[12] Accordingly, both sentences in §8.8(iv) plays a different and meaningful role in defining how the money which Millipore was to transfer to fund the Waters replacement defined benefit plan is to be determined.
In sum, I conclude that: (1) §8.8(iv) of the agreement is unambiguous, and must be interpreted according to its terms, see, e.g., Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992); and (2) the terms of §8.8(iv) require calculation of the PBO amount (a) in accordance with the methodology prescribed by FAS 87, and (b) using the specific actuarial assumptions set out in the 1994 Wyatt report, the parties having implicitly agreed that the report and its assumptions are in accord with FAS 87.[13]
II. Waters’ Cross-Motion for Summary Judgment
In its cross-motion, Waters claims that as matter of law (1) §8.8(iv) of the agreement requires that the PBO amount to be transferred from the Millipore retirement plan to the Waters replacement plan must satisfy FAS 87; and (2) the issue whether the PBO amount calculated by Millipore does comply with FAS 87 is subject to arbitration under § 12.10(a) of the agreement. In the alternative, Waters seeks a stay of this case until the ERISA issues raised in the action brought by Waters in the Federal District Court can be resolved.
With respect to Waters’ first claim, insofar as it seeks to establish that the agreement calls for the PBO to be determined in accordance with FAS 87, Waters is correct, but as the discussion above indicates, this is only part of the story. The PBO amount must be determined under FAS 87, but it also must be determined using the assumptions in the 1994 Wyatt valuation report. The provisions set out in the first and second sentences of §8.8(iv) must be read together, and when they are, the parties’ implied agreement or understanding that the Wyatt assumptions follow FAS 87 is clear.
Waters’ second claim concerning arbitration must be rejected. The arbitration clause in the agreement, §12.10(a) (as amended by Amendment No. 1), provides in relevant part as follows:
Millipore ... on the one hand, and [Waters], on the other hand (the “Parties”) agree that the arbitration procedure set forth below shall be the sole and exclusive method for resolving and remedying claims (i) for Damages arising out of the provisions of Sections 12.1 through 12.9 above and (ii) the enforcement of Section 14.9 below (collectively, "Disputes”).
As the quoted language indicates, this is a limited arbitration provision, and cannot be stretched to include disputes that are not subject to its terms. See Division 1205, Amalgamated Transit Union, AFL-CIO v. Greyhound Lines, Inc. 323 F.Supp. 219, 221 (D.Mass. 1971) (“a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit”). Compare Geller v. Temple B’Nai Abraham, 11 Mass.App.Ct. 917, 918 (1981) (where arbitration provision is in general terms, it should be construed as broadly as parties intended).
Waters appears to contend that arbitration is called for here because (1) Waters ultimately seeks specific *688 performance of Millipore’s obligation to transfer assets for the Waters replacement defined benefit plan in an amount that will comply with FAS 87 and ERISA; (2) specific performance is the subject matter of §14.9 of the agreement;[14] and (3) the arbitration clause, §12.10(a), provides that arbitration is to be the exclusive method for resolving claims involving “the enforcement of [§] 14.9 . . .” The difficulty with the argument is that it has no supporting factual basis in this case.
Whatever specific performance Waters might someday intend to seek from Millipore in relation to another dispute, the only demand for arbitration that Waters has ever sent to Millipore concerning the parties’ current dispute did not invoke §14.9 at all or even mention specific performance.[15] In this action, Millipore’s complaint seeks a declaratory judgment from this court. While declaratory judgment is a form of equitable relief, neither the arbitration clause (§12.10(a)) nor the specific performance clause (§14.9) obligates Millipore to pursue this type of relief through arbitration — indeed, §14.9 deals solely with Waters’ rights to seek specific performance and other forms of equitable remedies. Waters did not file a counterclaim for declaratory judgment or any other type of relief in this case. It is certainly entitled to move affirmatively for summary judgment in its favor on the claims raised here by Millipore, but its doing so does not invoke the arbitration provisions of the agreement.
Finally, there is the issue of Waters’ request for a stay. Waters argues at some length that it has a dispute with Millipore not only in relation to §8.8(iv) of the agreement because of the transfer provision, but also in connection with §8.8(iii),[16] and the two disputes are interrelated. Waters’ ultimate position is that Millipore has not met, and does not intend to meet, its commitment to transfer sufficient assets in the form of the PBO amount to meet the requirements of either FAS 87 or §414(1) of the Internal Revenue Code. Since compliance with §414(1) raises an issue of complying with ERISA, Waters believes that the Federal court must resolve the matter before any final resolution of this case can take place.
I do not agree. It seems that much of Waters’ claim is based on an interpretation of Millipore’s employee retirement plans which Millipore neither accepts nor follows in administering them. Even if Waters’ claim does reflect an accurate reading of the plans, however, there is no reason for a stay. The relief sought by Millipore here is a declaratory judgment stating the amount Millipore is to transfer in compliance with the agreement. Millipore’s claims in this case are based solely on the terms of the agreement itself, with no reference to the impact of ERISA or the Internal Revenue Code. Should the Federal court determine that the amount of funds transferred by Millipore pursuant to a judgment entered in this case violates any provision of ERISA or related sections of the Internal Revenue Code, there is no question that such a ruling would supersede this court’s judgment for all practical purposes. Nor does Millipore dispute that in such circumstances, Millipore’s indemnification obligations under the agreement would come into play. (See §§12.1 and 12.5 of the agreement.)[17] There is therefore no risk of inconsistent judgments, and no need for a stay.
III. The Amount To Be Transferred under §8.8(iv).
When Wyatt calculated the amount which Millipore was to transfer to the Waters replacement retirement plan under §8.8(iv) of the agreement, it arrived at a figure of $1,890,328.00. When Towers Perrin calculated the amount using the actuarial assumptions in the 1994 Wyatt valuation report, it arrived at a figure of $1,940,998.98. Section 8.8(iv) contains a provision at its end stating that:
... In the event these two actuarial firms [Wyatt and Towers Perrin] cannot agree on an amount to be transferred hereunder, a third, independent, actuarial firm acceptable to both Millipore and [Waters] will be engaged and the decision of such firm shall be binding . . .
While the parties could invoke this provision to resolve the difference in the transfer amount calculated by each actuary, Millipore has agreed to accept Towers Perrin’s numbers. Accordingly, engagement of a third actuarial firm is unnecessary.[18] In light of my conclusion that Millipore’s interpretation of §8.8(iv) in the agreement is correct, I also conclude that the amount Millipore is to transfer to Waters in satisfaction of its obligations under §8.8(iv) is $1,940,998.98.
ORDER
For the foregoing reasons, it is ordered that the motion for summary judgment of the plaintiff, Millipore Corporation, is allowed, and the cross-motion for summary judgment of the defendant, Waters Holding, Inc., is denied. It is further ordered that a final judgment enter in this action declaring that: (a) under Section 8.8(iv) of the parties’ agreement, the transfer of assets from the Millipore retirement plan to the Waters replacement defined benefit plan is to be calculated using the actuarial assumptions employed in the 1994 Wyatt valuation report, and those assumptions are implicitly deemed to be in accordance with the Financial Accounting Standards Board Statement No. 87; and (b) the amount to be transferred from the Millipore retirement plan to the Waters replacement defined benefit plan is $1,940,998.98.

 There Eire two documents which appear to fit the description of the 1994 Wyatt valuation report. One is entitled, “Retirement Plan for Employees of Millipore Corporation: Determination of Pension Expense under FASB Statement No. 87 for the Fiscal Year Ending December 31, 1994; the second is "Retirement Plan for Employees of Millipore Corporation, Actuarial Valuation Report as of January 1, 1994." (See affidavit of Michael Hluska, ex.A; deposition of Marcus H. Rafiee, January 31, 1996, ex. 3.) Both were prepared by *689 Wyatt and both are dated March, 1994. It appears that both parties treat the first described document (“Determination of Pension Expense under EASES Statement No. 87 for the Fiscal Year Ending December 31, 1994”) as the “1994 Wyatt valuation report,” and therefore I do as well.

 In its summary judgment papers, Waters agrees that the 1994 Wyatt valuation report explicitly assumes that everyone would retire early. It disputes that the report sets out the assumption that no employees would transfer their participation plan account balances to the retirement plan (referred to sometimes hereafter as the “zero transfer assumption”) in Table 6 of the 1994 Wyatt report, entitled ’’Actuarial Cost Method and Assumptions Used in the January 1, 1994 Valuation." However, Waters does not appear to dispute that the zero transfer assumption may be derived from Table 7 of the 1994 Wyatt report, which contains a summary of the principal provisions of the retirement plan. Millipore takes the position that the 1994 Wyatt valuation report is premised, inter alia, on an explicit zero transfer assumption, as well as an explicit early retirement assumption. (See deposition of Donald Hansen [Hansen dep.], p. 133.)

 As stated above, the Millipore retirement plan is a defined benefit plan.

 FAS 87, issued in 1985, establishes standards of financial reporting and accounting for an employer offering pension benefits to its employees, and in particular standards for the reporting and accounting of defined benefit pension plans. FAS 87 defines and discusses the components of net periodic pension cost and obligations that are to be recognized and reported by an employer for a particular accounting period. One of its goals is to attribute pension benefits [and thus employer cost] to periods of employee service, which involves, inter alia, calculating the actuarial present value of those benefits. This in turn requires the use of actuarial assumptions concerning issues and future events such as early retirement, turnover, mortality, future compensation levels, etc. FAS 87 requires that the assumptions used be explicit. (FAS 87, ¶87.14.) In addition, FAS 87 calls for using the specific terms of the pension plan as a basis for attributing pension benefits and their costs to periods of employee service. (FAS 87, ¶87.14.)

 Although the nature of Waters’ criticism of the 1994 Wyatt valuation report assumptions is somewhat of a moving target, Waters appears to argue that the principal flaw is the zero transfer assumption — i.e., the assumption that no employees will transfer their participation plan account balances to the retirement plan in order to receive retirement benefits in the form of an annuity rather than a lump sum — especially when combined with the assumption that all employees would retire early at 62. Waters’ position is that this is not a reasonable assumption — that in fact it is far more reasonable to assume, given the way Millipore’s employee retirement plans operate, that large numbers or even 100 percent of early retiring employees would take advantage of the transfer option; and if the latter assumption were used, there would be significant added liability for the plan. Waters claims that Millipore should have valued this added liability, which Water argues would increase the PBO to be transferred.

 It does not appear to be disputed that the phrase “the January 1, 1994 determination of pension expense valuation report prepared by the Wyatt Company” refers to the 1994 Wyatt valuation report. (See note 1 above.)

 While Millipore and Waters do not agree that the 1994 Wyatt report’s actuarial assumptions comply with FAS 87, the parties nevertheless appear to concur as a general matter that FAS 87 does not require in every case use of a single specific set of actuarial assumptions, and indeed, different sets of assumptions may equally satisfy FAS 87, so long as they are explicitly spelled out. (See Rafiee deposition, pp. 117, 198.)

 In this regard, in addition to §8.8(iv), see §8.8(ii) of the agreement which concerns the timing of the retirement and participation plan asset transfers from Millipore to Waters. The sense of the section is that the transfer is to be effected “as soon as practicable” after the closing date, consistent with Internal Revenue Service filing obligations.

 I accept, solely for purposes of Millipore’s summary judgment motion, that in accordance with Waters’ and its actuaries’ stated belief, the 1994 Wyatt valuation report may not meet the standards of FAS 87 because of the zero transfer assumption. (See note 6 above.) I note, however, that Millipore and its actuary Wyatt are adamant that the report does satisfy FAS 87 (see, e.g., Hansen dep., p. 134; see also affidavits of Michael Hluska and Scott Eston), and nothing in the summary judgment record suggests that the zero transfer assumption was, in 1994, anything but Wyatt’s and Millipore’s “best estimate” of a choice that Millipore’s employees would make in the future. (See Hansen dep., pp. 48-62.) The “best estimate" is what FAS requires. (FAS 87, ¶87.14.)

 At times Waters appears to contend that the 1994 Wyatt valuation report does not contain all the relevant actuarial assumptions. As noted previously (see note 2), Waters points out that Wyatt’s assumption that no retiring employees would transfer their account balances from the participation plan to the retirement plan for an annuity is not set forth in Table 6 of the report, which is entitled “Actuarial Cost Method and Assumptions Used in the January 1, 1994 Valuation,” but rather is derived from Table 7, “Summary of the Principal Provisions of the Plan as of January 1, 1994.” Section 8.8(iv) of the agreement, however, requires that the PBO be calculated “in accordance with the actuarial assumptions set forth in the January 1, 1994 determination of pension expense actuarial valuation report prepared by the Wyatt Company . . .”; there is no specific reference to which table or part of the report. Moreover, and more importantly, as the text indicates, Towers Perrin had no difficulty in identifying all the assumptions used by Wyatt from the report when Towers Perrin set out to calculate the PBO. Towers Perrin’s disagreement with those assumptions is a separate matter.

 Reading the agreement to contain an implicit understanding that the actuarial assumptions in the 1994 Wyatt valuation report complied with FAS 87 is supported by the report itself. It is entitled in relevant part, “Determination of Pension Expense Under FASB Statement No. 87 for the Fiscal Year Ending December 31, 1994" (emphasis supplied). It was, therefore, a report expressly prepared using the standards set out in FAS 87, and surely it goes without saying that in preparing the report, Wyatt considered it to comply with those standards.

 What FAS does require with respect to actuarial assumptions is that whatever assumptions are used must be explicit, and each is to “represent the best estimate of a particular future event.” (FAS 87, ¶87.14; see id., 8187.191.) Millipore takes the position that the 1994 Wyatt valuation report complies with these requirements, while Waters argues that at least one of Millipore’s explicit assumptions — the zero transfer assumption — is likely to be incorrect. As discussed above, in my view, Waters’ arguments come too late.

 What remains to be determined is the actual amount to be calculated. This point is addressed at the end of this memorandum of decision.

 Section 14.9 of the agreement provides:
Specific Performance. [Millipore] acknowledges] that the business of the Business is unique and recognize[s] and affirm[s] that in the event of a breach of this Agreement and/or the Transition Services Agreement by [Millipore], money damages may be inadequate and [Waters] may have no adequate remedy at law. Accordingly, [Millipore] agree[s) that [Waters) shall have the right, in addition to any other rights and remedies existing in its favor, to *690 enforce its rights and [Millipore’s] obligations hereunder and/or the Transition Services Agreement not only by an action or actions for damages but also by an action or actions for specific performance, injunctive and/or other equitable relief.

 See Demand for Arbitration dated August 17, 1995 (exhibit A to affidavit of Thomas P. Smith). As the demand reveals, Waters claimed arbitration of disputes involving “Damages," Under the arbitration provisions in the agreement, the term “Damages” is defined to mean “any loss . . . cost or expense . . . actually incurred . . (Agreement, §12.7; emphasis supplied.) Nothing has been presented in connection with the summaryjudgment motions or otherwise in this case to suggest that Waters has “actually incurred" any losses in relation to the provisions in the agreement relating to funding the Waters replacement defined benefit plan. At this point in the case, Waters seems to have abandoned any argument that arbitration of the parties’ dispute(s) is appropriate because the dispute(s) have given rise to “Damages.”

 Seclion 8.8(iii) provides in effect that Millipore agrees to transfers sufficient assets to the Waters replacement retirement plan to comply with the requirements of §414(1) of the Internal Revenue Code.

 Millipore has confirmed, through a letter of its counsel, that the indemnification provisions would apply should Waters be found liable under ERISA or the Internal Revenue Code on account of Millipore’s transfers of assets to the replacement defined benefit plan.

 The argument could be made that the provision for the engagement of a third actuary applies not only to differences reached by the actuarial firms when using the same actuarial assumptions, but also to different results which they might reach because each firm is using different actuarial assumptions — the situation Waters presents in this case, where it claims a dispute over the validity of the assumptions used by Wyatt and Millipore. Nevertheless, at this stage of the case, both parties have eschewed a reading of the agreement which would require resort to the third actuary provision to resolve this latter type of disagreement, and I do not consider it any further.